IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ELMER WILSON,                    )
                                 )
                Plaintiff,       )
                                 )    No.  CV-07-165-HU
        v.                       )
                                 )
MICHAEL ASTRUE,                  )
Commissioner, Social Security )      FINDINGS & RECOMMENDATION
Administration,                  )
                                 )
                Defendant.       )
————————————————————————————————)

Rory Linerud
P.O. Box 1105
Salem, Oregon 97308

        Attorney for Plaintiff

Karin J. Immergut
UNITED STATES ATTORNEY
District of Oregon
Brittania I. Hobbs
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue
Portland, Oregon 97204-2902

Terrye E. Shea
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Assistant Regional Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

        Attorneys for Defendant

1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Elmer C. Wilson brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB).  This Court has jurisdiction under 42 U.S.C. § 405(g).  I recommend that the Commissioner's final decision be reversed and remanded for further proceedings.

PROCEDURAL BACKGROUND

Plaintiff applied for DIB in October 2003, alleging an onset date of July 30, 2002.  Tr. 51-53.  His application was denied initially and on reconsideration.  Tr. 21-32.

On June 7, 2006, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ).  Tr. 588-612.  On June 23, 2006, the ALJ found plaintiff not disabled.  Tr. 11-20.  The Appeals Council denied plaintiff's request for review of the ALJ's decision.  Tr. 7-9.

FACTUAL BACKGROUND

In his initial DIB application, plaintiff alleged disability based on emphysema, arthritis, degenerative disc disease, and shoulder injuries.  Tr. 93.  He also raises depression as an additional basis for disability, although he did not do so until this appeal.

At the time of the June 7, 2006 hearing, plaintiff was forty-six years old.  Tr. 592.  He has a general equivalence diploma (GED).  Id.  His past relevant work is as a cable television installer, carpenter, equipment operator, commercial thinner (timber), and fruit processor.  Tr. 113.

Plaintiff's legal memorandum in support of his request that the Commissioner's decision be overturned, raises arguments

1  involving his shoulder injuries and his alleged depression.  Given

2  these limited issues, I include only factual evidence relevant to

3  those conditions.

4  I.  Medical Evidence

5      The earliest report of shoulder problems appears in late

6  December 1987 and early January 1988, following a motor vehicle

7  accident in which plaintiff suffered, <u>inter</u> <u>alia</u>, an anterior

8  subluxation of the right sternoclavicular joint.  Tr. 213-15.  He

9  also suffered a right shoulder contusion.  Tr. 215.  No specific

10 treatment was offered and on February 29, 1988, plaintiff requested

11 a release to return to his regular job from Dr. William Spina,

12 M.D., the orthopedic surgeon who treated him.  Tr. 212-13.  Dr.

13 Spina provided the work release.  Tr. 212.

14     Mild depression is first noted in the medical records in an

15 October 6, 1988 report by Jack Davies, Psy. D., Clinical

16 Psychologist.  Tr. 250-51.  Apparently, as part of a worker's

17 compensation claim for a 1986 low back strain, plaintiff was

18 required to take the Minnesota Multiphasic Personality Inventory

19 (MMPI) test, administered by Dr. Davies.  <u>Id.</u>  While most of Dr.

20 Davies's two-page report addresses other issues, in the final

21 paragraph he notes the presence of mild depression.  Tr. 251.

22     In January 1998, plaintiff complained to Dr. John Bagdade,

23 M.D., of the onset of right shoulder pain three years earlier.  Tr.

24 439.  Plaintiff reported that he had no history of trauma to the

25 area.  <u>Id.</u>  He stated that as of August 1997, the pain had reached

26 a level which prevented him from working.  <u>Id.</u>  Plaintiff reported

27 that the pain was aggravated by movement, particularly when he

28 moved his arm medially.  <u>Id.</u>  On physical examination, Dr. Bagdade

3 - FINDINGS & RECOMMENDATION

1  found that plaintiff had local pain to palpation over the upper
2  aspect of the shoulder joint, he could not lift his arm to the
3  horizontal position, and that he had pain on internal rotation.
4  Id.

5      An x-ray taken on January 8, 1998, showed some mild
6  degenerative changes of the inferior aspect of the
7  acromioclavicular (AC) joint with no other significant bone or soft
8  tissue abnormality.  Tr. 438.

9      Dr. Bagdade referred plaintiff to Dr. Fred Davis, M.D., who
10  saw plaintiff on January 30, 1998.  Tr. 436.  Plaintiff reported to
11  Dr. Davis that he experienced pain in the deltoid region and had
12  limited motion in the abduction[1] range.    Id.   On physical
13  examination, Dr. Davis found pronounced hypertrophy[2] of the AC
14  joint, with mild to moderate tenderness.  Id.  The clavicle was
15  stable.  Id.  Plaintiff had a positive impingement sign and mild
16  tenderness of the greater tuberosity.[3]    Id.   There was fine
17  crepitation[4] in the subacromial space with rotation and abduction.
18  Id.  There was no clinical instability.  Id.

19      Plaintiff also had limited internal rotation, bringing his
20  right hand to the sacrum, and his left hand to the inferior angle

21

22  [1]  "The lateral movement of the limbs away from the median
     plane of the body[.]"  Taber's Cyclopedic Medical Dictionary 5
23  (Clayton L. Thomas, M.D., M.P.H., ed., 14th ed. 1981).

24  [2]  "Increase in size of an organ or structure which does not
     involve tumor formation."  Taber's 692.
25

26  [3]  "An elevated round process of a bone."  Taber's 1497.

27  [4]  "A crackling sound heard in certain diseases[,]" or "[a]
     grating sound heard on movement of ends of a broken bone."
28  Taber's 347.

4 - FINDINGS & RECOMMENDATION

of the scapula.  Id.  His external rotation was full.  Id.  Dr. Davis diagnosed plaintiff with acromioclavicular arthritis with a large inferior osteophyte.  Id.  He also found that plaintiff had impingement syndrome, possibly related to the arthritis.  Id.

That same day, plaintiff had an ultrasound of his shoulder which showed a "[f]ocal 3 mm intrasubstance defect within the right supraspinatus," which "would be most consistent with a partial thickness tear."  Tr. 436.

On February 3, 1998, plaintiff followed up with Dr. Davis, after the ultrasound.  Tr. 434.  Dr. Davis noted that the ultrasound showed a partial thickness tear, which was quite small, of the right rotator cuff.  Id.  Dr. Davis opined that plaintiff had a good chance of healing this through physical therapy.  Id. On March 2, 1998, plaintiff reported to Dr. Davis that the physical therapy had not helped, and in fact, had resulted in increased symptoms.  Tr. 433.  Dr. Davis offered plaintiff a corticosteroid shot, but plaintiff refused.  Id.  Plaintiff told Dr. Davis that he was going to try to establish a worker's compensation claim and when that was accomplished, he would call Dr. Davis for surgical scheduling.  Id.

The next reference to plaintiff's shoulders is a May 31, 2003 note by Santiam Hospital Emergency Room physician Dr. Robert Jacques, M.D.  On that date, plaintiff reported falling while getting out of the bathtub, injuring his right shoulder.  Tr. 349. He denied any previous or antecedent injury to the right shoulder. Id.

Upon physical examination, Dr. Jacques reported that the shoulder "[r]esists flexion, extension, abduction, internal and

5 - FINDINGS & RECOMMENDATION

external rotation without a significant amount of discomfort. There does not appear to be any deformity. No evidence of dislocation is perceived. Tenderness over the anterior rotator cuff region is noted." Tr. 349. X-rays revealed no dislocation or fracture of the right shoulder. <u>Id.</u> Dr. Jacques concluded that plaintiff probably had a rotator cuff tear. <u>Id.</u> He was given a sling to immobilize the shoulder, and instructed to follow up with a primary care physician within the next week. <u>Id.</u> He was discharged with a prescription for Vicodin. <u>Id.</u>

Apparently, because of a lack of insurance, plaintiff did not see a physician for follow-up treatment of his shoulder. Tr. 353. Rather, on November 4, 2003, he saw Dr. John French, M.D., of the Physical Medicine & Rehabilitation/Occupational Medicine Department of Salem Hospital, for a Disability Determination. Tr. 353-55.

At that time, plaintiff complained of "bilateral shoulder problems." Tr. 353. Plaintiff told Dr. French that his left shoulder had been bothering him since 1977, and that his right shoulder started bothering him in 1995 when he was using a pick. <u>Id.</u> He also related that he had a fall about five months before seeing Dr. French, which re-injured the right shoulder. <u>Id.</u> Plaintiff described it as "unstable" since that time, with the ability to dislocate it at will. <u>Id.</u>

On physical examination, Dr. French noted that plaintiff had "moderate pain behaviors," with "fair effort." Tr. 354. He found "some weakness in rotation of the right shoulder with rotators at about 3+/5 with some give away weakness." <u>Id.</u> Otherwise, plaintiff exhibited good strength in both upper and lower extremities with "[n]o neurogenic weakness noted." <u>Id.</u>

6 - FINDINGS & RECOMMENDATION

1    Plaintiff was able to "actively abduct the right shoulder to
2    about 45 degrees," but then was limited by pain.  Id.  Plaintiff
3    appeared to have a functionally intact rotator cuff.  Id.  He was
4    tender in bicipital groove, subacromial space, and had a "positive
5    apprehension sign."  He also had a negative sulcus[5], but was
6    somewhat resistant and guarded during the exam.  Id.  He had good
7    cervical range and negative Spurling's.[6]  Id.

8    For his left shoulder, Dr. French noted that it was "guarded
9    at end range."  Id.  There was "[n]egative apprehension" and no
10   sulcus.  Id.  Dr. French found some tenderness in the bicipital
11   groove and less pain behavior.  Id.  Dr. French described the right
12   shoulder as being lower than the left while plaintiff was seated
13   and standing.  Id.

14   Dr. French's impression was that plaintiff had evidence of
15   some right shoulder dysfunction, likely a rotator cuff tear and
16   possibly some instability of the shoulder.  Tr. 354.  He stated
17   that this would "heavily limit functional use of the right upper
18   extremity, especially in abduction or any overhead activities."
19   Id.

20   In a separate form signed by Dr. French, plaintiff was limited
21
22   _____
23   [5]  "A furrow, groove, slight depression, or fissure[.]"
     Taber's 1389; see also
24   http://orthoassessment.blogspot.com/2007/01/shoulder-sulcus-sign.
     htmlo (sulcus sign is an examination to determine the extent
25   and/or presence of inferior instability of the glenohumeral
     joint).
26
27   [6]  Spurling's test, used to determine the presence of
     cervical nerve root disorder, is done with the "[s]pine extended
28   with head rotated to affected shoulder while axially loaded[.]"
     http://www.aafp.org/afp/20000515/3079.html.

7 - FINDINGS & RECOMMENDATION

1  to occasionally lifting or carrying fifteen pounds or less, and
2  frequently lifting or carrying ten pounds or less.  Tr. 356.  Dr.
3  French further remarked that plaintiff reported right shoulder pain
4  when lifting fifteen pounds and that he consistently guarded his
5  right upper extremity.  Id.

6     Dr. French further indicated plaintiff's current range of
7  motion with the shoulder, in an expression of degrees.  Tr. 358.
8  Plaintiff had a maximum range of motion with his left shoulder as
9  follows:  (1) abduction - 60 degrees; (2) adduction - 35 degrees;
10 (3) extension - 33 degrees; (4) flexion - 93 degrees.  Id.
11 Plaintiff had a maximum range of motion with his right shoulder as
12 follows:  (1) abduction - 35 degrees; (2) adduction - 18 degrees;
13 (3) extension - 30 degrees; (4) flexion - 32 degrees.  Id.

14    On February 12, 2004, Disability Determination Services (DDS)
15 physician Dr. Martin Kehrli, M.D., issued a residual functional
16 capacity (RFC) evaluation of plaintiff.  Tr. 360-66.  Dr. Kehrli
17 concluded that plaintiff could occasionally lift or carry twenty
18 pounds, and could frequently lift or carry ten pounds.  Tr. 361.
19 He also concluded that plaintiff's shoulder, with a probable
20 rotator cuff tear, limited plaintiff to "occasional push pull." Tr.
21 361-62.  Dr. Kehrli further limited plaintiff to occasional
22 reaching in all directions, including overhead, because of the
23 right shoulder probable rotator cuff tear.  Tr. 362.

24    On April 22, 2004, Dr. Scott Pritchard, D.O., affirmed Dr.
25 Kehrli's assessment.  Tr. 365.

26    On May 6, 2004, plaintiff's then primary care physician Dr.
27 Paul Neumann, M.D., referred plaintiff to Dr. Richard Tobin, M.D.,
28 for consultation regarding plaintiff's right shoulder pain and

8 - FINDINGS & RECOMMENDATION

suspected rotator cuff tear. Tr. 427. Dr. Tobin examined plaintiff on May 24, 2004. Tr. 425-26. Plaintiff told Dr. Tobin that he initially injured the shoulder using a pick axe, and re-injured it in a fall approximately one year earlier. Tr. 425. He described being in continual pain since then. Id. He reported experiencing pain running down his arm and painful clicking in the shoulder. Id. He was unable to use the arm. Id.

After a physical examination, and a review of plaintiff's x-rays from one year previously, Dr. Tobin concluded that plaintiff suffered from chronic impingement with rotator cuff tears. Tr. 426. He suspected that plaintiff had a full thickness tear at that point. Id. He recommended that plaintiff undergo arthroscopic surgery for subacromial decompression with a distal clavicle resection, and a rotator cuff repair. Id.

Plaintiff was scheduled for surgery on June 24, 2004. Tr. 418. On June 10, 2004, Dr. Neumann wrote to Dr. Tobin regarding Dr. Tobin's request for surgical clearance. Id. Dr. Neumann noted that plaintiff had been referred to cardiology for evaluation of an abnormal EKG and atypical chest pains. Id. Dr. Neumann also noted that he himself was evaluating plaintiff for hyponatremia.[7] Id. Dr. Neumann explained that the cardiac evaluation and electrolyte abnormalities precluded plaintiff's elective surgery. Id. But, he noted that the status may change as further work-up was completed. Id. He indicated that efforts would be made to complete the work-up before the surgery date. Id. He also noted that he hoped

---

[7] "Decreased concentration of sodium in the blood." Taber's 697.

9 - FINDINGS & RECOMMENDATION

plaintiff would be able to have the shoulder repaired as plaintiff's quality of life was significantly affected by his shoulder injury.  Id.

On June 17, 2004, Dr. Tobin noted that plaintiff's surgery was cancelled because of the cardiac work-up.  Tr. 444.  The surgery was rescheduled for a later date.  Id.  The second surgery was cancelled as well because during the period between the two scheduled surgeries, the Oregon Health Plan changed its criteria and refused to authorize the surgery.  Id.

As part of his cardiac work-up, plaintiff was examined by cardiologist Dr. James Wasenmiller, M.D., on August 4, 2004.  Tr. 459.  There, Dr. Wassenmiler noted that plaintiff had a history of depression and was currently taking 20 milligrams of Prozac.  Id. The record does not establish when plaintiff started taking Prozac or who prescribed it.  Dr. Wasenmiller made no indication of the severity of the depression or how it affected plaintiff.

In September 2004, plaintiff was reported by Dr. Walter Whitman, M.D., to be taking 20 milligrams of Prozac per day "because of his worries about his orthopedic problems."  Tr. 396. Dr. Whitman, a specialist in nephrology, examined plaintiff for hyponatremia at Dr. Neumann's request.  Tr. 395.

In April 2005, plaintiff established a primary care relationship with Dr. James Pennington, M.D. Tr. 550, 580. In his May 17, 2005 visit with Dr. Pennington, plaintiff apparently reported that he suffered from mild depression due to chronic pain. Tr. 549, 579. At the time, however, he was no longer taking Prozac or another similar medication.  Id.  Dr. Pennington adjusted several of plaintiff's medications, and prescribed Amitriptyline,

10 - FINDINGS & RECOMMENDATION

apparently to assist plaintiff with sleeping.  Tr. 548-49, 578-79.
Dr. Pennington noted that plaintiff was applying for disability at
the time.  Tr. 548, 578.  He stated that he "certainly believed[d]
that he is at least temporarily disabled for now and should have
surgery on shoulder, [bilateral inguinal] hernias, and [bilateral
carpal tunnel syndrome]."  Id.

In February 2006, plaintiff was seen by Dr. John Durkan, M.D.,
regarding possible carpal tunnel surgery.  Tr. 565.  He also
complained about shoulder pain to Dr. Durkan, who noted that
examination of both shoulders revealed some subacromial crepitus.
Id.  Dr. Durkan did note that plaintiff was somewhat difficult to
examine because he had a "fair amount of pain behavior," and
because any abduction above 90 degrees in either shoulder was quite
painful and limited.  Id.

In March 2006, plaintiff underwent carpal tunnel surgery.  In
a preoperative outpatient surgery admission form, plaintiff checked
that he had no history of psychological conditions, including
depression.  Tr. 534.

In June 2006, plaintiff had MRIs of both shoulders.  Regarding
the left shoulder, the imaging study showed the following:  (1) a
possible partial tear of the biceps tendon; (2) degeneration and
partial tear of the supraspinatus tendon fibers, most prominent
anteriorly; difficult to exclude a small focal full-thickness tear;
(3) degeneration and partial tear of the subscapularis tendon; (4)
hypertrophic change and edema within the AC joint with a small spur
inferiorly, creating the potential to impinge upon the underlying
rotator cuff tendons; and (5) irregular appearance of the anterior
superior aspect of the labrum which likely represented some degree

11 - FINDINGS & RECOMMENDATION

of degeneration and possible partial tear.   Tr. 585.

As for the right shoulder, the results were:  (1)  torn biceps tendon with an irregular spur/osteophyte along the anterolateral aspect of the humerus along the course of the tendon which may impinge upon the biceps tendon as it courses superiorly; (2) focal, full-thickness tear of the anterior fibers of the supraspinatus tendon; an approximate 6 millimeter gap within the tendon and slight retraction of the tendon fibers and a partial tear and degeneration of the infraspinatus tendon fibers; (3) partial tear of the subscapularis tendon; (4) hypertrophic change and edema within the AC joint, with a small inferior spur present, creating the potential to impinge upon the underlying rotator cuff tendons; and (5) mild degeneration of the superior labrum.   Id.

In a letter dated August 28, 2006, Dr. Pennington wrote that plaintiff has bilateral rotator cuff tears with AC impingement of the right shoulder.   Tr. 581.   He further stated that because of that diagnosis, plaintiff "may have occasional flare ups which may not allow him to work."   Id.

II.  Plaintiff's Testimony

At the hearing, plaintiff testified that his last job was as a cable television installer in July 2002.   Tr. 594.   He stated that he had shoulder problems while doing that work.   Tr. 595.   He described experiencing throbbing, aching pain in both shoulders, and grinding and popping in his right shoulder.   Tr. 596.   He indicated that his right shoulder was worse than his left.   Id.   He noted that the shoulder pain gave him trouble on the job when he tried to work over his head.   Tr. 597.   He also experienced trouble crawling underneath houses and getting up into attic spaces because

12 - FINDINGS & RECOMMENDATION

1  of the shoulder pain.  Id.

2      Plaintiff testified that since he last worked in 2002, his
3  symptoms have gotten worse.  Tr. 600.  He particularly noted that
4  in May 2003, he fell and dislocated his right shoulder, which "has
5  been way worse since then[.]"  Id.  As a result, he quit doing yard
6  work or house work and cannot handle doing physical work.  Tr. 601.

7      Plaintiff stated that at the time of the hearing, he
8  experienced constant pain in his shoulders.  Tr. 601-02.  The ALJ
9  clarified with plaintiff that after the shoulder surgery was
10  denied, it had never been rescheduled.  Tr. 594.

11      Plaintiff made no mention of experiencing depression.

12  IV.  Vocational Expert Testimony

13      Vocational Expert (VE) Patricia Ayerza testified at the
14  hearing.  The ALJ posed the following hypothetical to the VE:
15  consider an individual the same age as plaintiff with the same
16  educational background and work experience, who can lift or carry
17  15 to 20 pounds occasionally, and 10 pounds frequently, and would
18  require a "sit stand option" for the day at work.  Tr. 609.  In
19  addition, due to shoulder problems, the individual would be limited
20  to occasional overhead work or occasional abduction above shoulder
21  height.  Tr. 609-10.  The individual would be further limited to
22  occasional kneeling, crouching, and crawling, occasional use of
23  ramps or stairs, and no use of ladders, ropes, or scaffolds.  Tr.
24  610.  Finally, the individual would be limited to simple one, two,
25  and three step work because of the possibility of pain distraction.
26  Id.

27      In response, the VE testified that the person could not
28  perform the plaintiff's past work.  Id.  As to other jobs, she

13 - FINDINGS & RECOMMENDATION

1  testified that the person could perform small product assembler
2  jobs or booth cashiering positions.   Tr. 611.   The VE testified
3  that there were 1,400 small product assembler jobs regionally, and
4  97,000 of such jobs nationally.  Id.  She also testified that there
5  were 800 booth cashiering jobs regionally, and 56,000 nationally.
6  Id.

7       The ALJ then asked that if the person could maintain
8  competitive employment if the person could not endure work on a
9  full-time basis and would miss work consistently once or twice per
10 month.   Id.   The VE responded that the person could not maintain
11 competitive employment in these types of positions.   Id.

                           THE ALJ'S DECISION

13      The ALJ first found that plaintiff last met the insured status
14 requirement of the Social Security Act on September 30, 2005.  Tr.
15 15.   The ALJ then determined that plaintiff had not engaged in
16 substantial, gainful activity at any time relevant to his decision.
17 Id.   He next determined that plaintiff had the following severe
18 combination of impairments:  mild lumbar degenerative disc disease
19 and status post left knee surgery.   Id.   He concluded that
20 plaintiff's bilateral carpal tunnel syndrome, right hip, and
21 cervical pain were not severe impairments, either individually or
22 in combination.  Id.  The ALJ then determined that through the last
23 insured date of September 30, 2005, plaintiff did not have an
24 impairment or combination of impairments that met or medically
25 equaled a listed impairment. Tr. 15-16.  The ALJ did not discuss
26 plaintiff's shoulders in his Step 2 analysis.

27      Next, the ALJ determined plaintiff's RFC.   Tr.  16.   He
28 concluded that through the date last insured, plaintiff had the RFC

1  to perform modified light exertional work involving frequent
2  lifting of 10 pounds, occasional lifting of 15 to 20 pounds, and a
3  sit/stand option.  Id.  He also limited plaintiff to occasional
4  bending, kneeling, crouching, crawling, and overhead work above the
5  shoulder.  Id.  He stated that plaintiff had to avoid ladder work,
6  and due to pain, was limited to simple 1-3 step instruction which
7  was classified as unskilled work.  Id.

8      As part of this determination, the ALJ found that plaintiff's
9  medically determinable impairments could have been reasonably
10 expected to produce some of plaintiff's alleged symptoms, but that
11 the plaintiff's statements concerning the intensity, duration, and
12 limiting effects of these symptoms were not credible.  Tr. 17.  As
13 one specific example, he noted that while plaintiff asserted in his
14 October 2003 written statement that since 2002, increased pain had
15 precluded his ability to engage in outdoor activities he formerly
16 enjoyed such as hunting, fishing, and camping, this assertion was
17 contradicted by plaintiff's having engaged in these activities, or
18 some of them, in 2004.  Id.  As a result, the ALJ noted that the
19 ALJ's determination had to rely primarily on information contained
20 in plaintiff's medical records rather than the plaintiff's
21 subjective testimony.  Id.

22     The ALJ discounted Dr. Pennington's May 2005 chart note that
23 Dr. Pennington "believed" that plaintiff was at least temporarily
24 disabled and should have shoulder surgery.  Id.  The ALJ noted that
25 most of Dr. Pennington's treatment of plaintiff was outside the
26 time frame of the decision because plaintiff's insured status
27 expired on September 30, 2005, and Dr. Pennington started treating
28 plaintiff only in April 2005.  Id.  The ALJ further noted that at

15 - FINDINGS & RECOMMENDATION

that time, Dr. Pennington's "belief" was not supported by objective medical evidence and that it lacked specificity.  <u>Id.</u>[8]

The ALJ next discussed that from the alleged onset date of July 30, 2002, to the date of last insurance, the objective medical records tended to undermine plaintiff's allegations.  <u>Id.</u>  In regard to the shoulder, he noted that Dr. French's November 2003 disability evaluation revealed a right shoulder dysfunction, but that Dr. French also found plaintiff's effort during the examination as only "fair."[9]  Tr. 18.  The ALJ further noted that the ALJ's RFC determination nonetheless incorporated most of the work limitations recommended by Dr. French in terms of sitting, standing, walking, and carrying.  <u>Id.</u>

The ALJ stated that he adopted the 2004 opinions of Dr. Kehrli and Dr. Pritchard, the DDS reviewing physicians, that plaintiff was

---

[8]  Although the ALJ's rejection of Dr. Pennington's May 2005 opinion has not been briefed by the parties, I find little in the record to support the ALJ's conclusion that Dr. Pennington's opinion was not supported by objective medical evidence and lacked specificity.  The record shows that well before he saw Dr. Pennington, plaintiff had previously been recommended for shoulder surgery, following years of complaints, physical examinations, and x-rays showing chronic impingement with rotator cuff tears, including a full thickness tear as of May 2004.  Tr. 426.  Moreover, although most of Dr. Pennington's treatment of plaintiff was rendered after plaintiff's insured status expired, it is unclear to me why an opinion he rendered while plaintiff was still insured, in fact four months before the expiration of his insured status, is somehow not credible simply because he provided services beyond the insured date.  Because, as discussed below, I recommend remand for the ALJ to address inconsistencies in his determination, I further recommend that the ALJ re-examine this issue as well.

[9]  Given plaintiff's history of shoulder problems, one can hardly expect him to put forth the full effort expected of a person with an intact rotator cuff.

16 - FINDINGS & RECOMMENDATION

1   capable of light work with postural and overhead reaching
2   limitations.  Id.

3       Based on this RFC, the ALJ concluded that plaintiff could not
4   perform his past relevant work, but that he could perform the jobs
5   of small products assembler and booth cashier, which exist in
6   significant numbers in the national economy.  Id. at pp. 18-19.
7   Thus, the ALJ concluded that plaintiff was not disabled.  Id. at
8   pp. 19-20.

9               STANDARD OF REVIEW & SEQUENTIAL EVALUATION

10       A claimant is disabled if unable to "engage in any substantial
11  gainful activity by reason of any medically determinable physical
12  or mental impairment which . . . has lasted or can be expected to
13  last for a continuous period of not less than 12 months[.]"  42
14  U.S.C. § 423(d)(1)(A).    Disability claims are evaluated according
15  to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395
16  (9th Cir. 1991).    The claimant bears the burden of proving
17  disability.  Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.
18  1989).  First, the Commissioner determines whether a claimant is
19  engaged in "substantial gainful activity."  If so, the claimant is
20  not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20
21  C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner
22  determines whether the claimant has a "medically severe impairment
23  or combination of impairments."  Yuckert, 482 U.S. at 140-41; see
24  20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not
25  disabled.

26       In step three, the Commissioner determines whether the
27  impairment meets or equals "one of a number of listed impairments
28  that the [Commissioner] acknowledges are so severe as to preclude

17 - FINDINGS & RECOMMENDATION

substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d).    If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.  <u>Yuckert</u>, 482 U.S. at 141.

    In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant can, he is not disabled.  If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work.  <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.    20 C.F.R. §§ 404.1566, 416.966.

    The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. <u>Baxter</u>, 923 F.2d at 1394.  Substantial evidence means "more than a mere scintilla," but "less than a preponderance."  <u>Id.</u>  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Id.</u>

                              DISCUSSION

    Plaintiff alleges that the ALJ erred in the following ways: (1)  by failing to recognize his shoulder condition as a severe impairment; (2) by failing to incorporate all of plaintiff's shoulder-related limitations into the RFC; and (3) by failing to develop the record regarding plaintiff's alleged depression.   I address the arguments in turn.

18 - FINDINGS & RECOMMENDATION

I.  Shoulder Impairment as Severe Impairment

In making his determination regarding plaintiff's severe impairments, the ALJ made only a single mention of plaintiff's shoulder.  He stated:  "On November 4, 2003 Dr. French's examination showed no functional loss or objective findings to explain the claimant's hip, hand, or shoulder complaints."  Tr. 15.

Plaintiff contends that the medical evidence establishes that his shoulder impairment is severe.  In particular, he notes that DDS physicians Dr. Kehrli and Dr. Pritchard, whose opinions the ALJ relied on in other aspects, stated that he has a probable rotator cuff tear in his right shoulder and recommended certain limitations in his abilities as a result of this particular diagnosis.

A severe impairment is one that limits a plaintiff's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c).  "An impairment . . . may be found not severe <u>only</u> if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  <u>Webb v. Barnhart</u>, 433 F.3d 683, 686 (9th Cir. 2005) (internal quotation omitted).  "Step two, then, is a de minimis screening device used to dispose of groundless claims[.]"  <u>Id.</u> (internal quotation and brackets omitted).

In examining the record as a whole, I agree with plaintiff that the ALJ erred by concluding that his right shoulder impairment was not a severe impairment.  First, the ALJ failed to address other relevant medical evidence in the record in making this determination, evidence within the relevant time period of July 30, 2002 (alleged onset date) and September 30, 2005 (expiration of insured status).

19 - FINDINGS & RECOMMENDATION

In addition to Dr. French's assessment, Dr. Jacques, in May 2003, opined that plaintiff had a probable rotator cuff tear. Tr. 349. In May 2004, orthopedic surgeon Dr. Tobin, after a physical examination and a review of x-rays from May 2003, suspected that plaintiff had a full thickness rotator cuff tear and chronic impingement of the right shoulder. Tr. 426. When his June 2004 surgery had to be rescheduled because of the cardiac work-up, Dr. Neumann, plaintiff's primary care physician, stated that plaintiff's shoulder injury significantly affected his quality of life. Tr. 418.

Second, the ALJ erred when he stated, in dismissing plaintiff's shoulder injury as a severe impairment, that Dr. French's examination showed no functional loss.[10]  Dr. French performed a comprehensive physical examination of plaintiff. Tr. 353-58. He noted that plaintiff likely had a rotator cuff tear in his right shoulder and instability of the shoulder. Tr. 354. He stated that this impairment would "heavily limit functional use of the right upper extremity, especially in abduction or any overhead activities." Id.

His records include diagrams, and assessments in terms of

---

[10]  As quoted above, in rejecting plaintiff's shoulder impairment as severe, the ALJ stated "[o]n November 4, 2003, Dr. French's examination showed no functional loss or objective findings to explain the claimant's hip, hand, or shoulder complaints." Tr. 15. Notably, later in his decision, the ALJ stated that "[w]ith the sole exception of right shoulder dysfunction, there were no objective findings to support the claimant's complaints." Tr. 18. I credit the latter sentence over the former one because the latter is a specific reference to the evidence regarding the shoulder injury while the former appears to relate more to the evidence of hip or hand complaints.

20 - FINDINGS & RECOMMENDATION

degrees, of the range of joint movement for several parts of plaintiff's body, including his shoulders. Tr. 357-58. As noted above, as to plaintiff's right shoulder, Dr. French found that plaintiff could abduct his right shoulder only 35 degrees and could adduct it only 18 degrees. Tr. 358. He was able to extend it only 30 degrees and flex it only 32 degrees. Id.

Normal ranges for these joint motions, as indicated on Dr. French's diagrams, are 150 degrees for abduction, 30 degrees for adduction, 45 degrees for extension, and 150 degrees for flexion. Id. Thus, Dr. French's physical examination, as shown in the chart notes and diagrams, details the degree of functional loss in plaintiff's shoulder.

Third, while I agree with defendant that a mere reference in a report by the DDS reviewing physician to a possible rotator cuff injury is insufficient by itself to establish that an impairment is severe, it is undisputed that Dr. Kehrli's assessment, later affirmed by Dr. Pritchard, includes functional and work-related restrictions on plaintiff's use of his right upper extremity, directly attributable to the shoulder injury. Tr. 361-62, 366. Moreover, the ALJ himself limited plaintiff's upper extremity use as a result of plaintiff's shoulder problem. These limitations themselves show that plaintiff's shoulder injury affects his ability to work.

Accordingly, the record establishes that plaintiff has more than a slight abnormality that has more than a minimal effect on his ability to work. The ALJ erred in concluding that the right shoulder injury is not a severe impairment.

/ / /

21 - FINDINGS & RECOMMENDATION

1    II.    RFC

2          Defendant contends that even if the ALJ erred in his

3    determination that the shoulder injury was a non-severe impairment,

4    the error is harmless because the ALJ incorporated the limitations

5    from the shoulder injury into his RFC in any event.    Plaintiff

6    contends that the ALJ failed to include all of those limitations.

7    Specifically, plaintiff argues that the ALJ erred when he (1)

8    failed to incorporate a limitation assessed by Dr. Kehrli and Dr.

9    Pritchard restricting plaintiff to only occasional pushing and

10   pulling, and (2) failed to include the overhead limitation exactly

11   as described by Dr. Kehrli and Dr. Pritchard.

12         Defendant is correct that a step two error may be harmless if

13   the ALJ accounts for the impairment later in the sequential

14   evaluation process.    Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir

15   2007) (step two error harmless because ALJ considered limitations

16   at step four).    Here, the ALJ's RFC included lifting limits and

17   "occasional . . . overhead work above the shoulder."    Tr. 16.

18         As noted above, the ALJ rejected plaintiff's excess subjective

19   symptom testimony and relied primarily on information in

20   plaintiff's medical records to evaluate his work limitations and

21   disability status.    Tr. 17.    Thus, in his discussion, he states

22   that "[i]n their [referring to Dr. Kehrli and Dr. Pritchard]

23   combined opinion, the claimant was capable of light work with

24   postural and overhead reaching limitations.    Their conclusion that

25   the claimant is no longer capable of hard physical labor is adopted

26   in this decision, as are their specific proposed work limitations."

27   Tr. 18 (emphasis added).    While the ALJ articulates that he adopts

28   the specific limitations, he fails to incorporate the "occasional

22 - FINDINGS & RECOMMENDATION

1   push/pull" limitation into his RFC.

2       Defendant acknowledges the omission, but argues that the RFC
3   is supported by plaintiff's own testimony at the hearing and Dr.
4   French's assessment.  The problem with defendant's argument is that
5   the ALJ's decision is internally inconsistent with no explanation
6   for omitting a limitation the ALJ articulated he was incorporating.

7       Moreover, I cannot endorse defendant's argument that the RFC
8   is supported by plaintiff's own testimony.  Plaintiff's testimony
9   regarding his shoulder included a reference to pain, and to
10  problems on the job with working overhead and crawling.  Tr. 596-
11  97.  Thus, when the ALJ generally rejected plaintiff's subjective
12  testimony, he did not reject testimony regarding pulling and
13  pushing.  Additionally, the ALJ expressly adopted the "specific
14  proposed work limitations" assessed by Dr. Kehrli and Dr. Pritchard
15  after he rejected plaintiff's testimony.  Thus, it is unclear how
16  that testimony can support the RFC which omitted the limitations.

17      Finally, nothing in Dr. French's assessment indicates, one way
18  or the other, whether a push/pull limitation is appropriate.  Dr.
19  French simply did not address this.  He did note that plaintiff's
20  shoulder injury would "heavily limit functional use of the right
21  upper extremity, especially in abduction or any overhead
22  activities."  Tr. 354.  While specifically noting the abduction or
23  overhead movements, his conclusions are not inconsistent with a
24  push/pull limitation.

25      Without some articulation by the ALJ as to why, on the one
26  hand, he stated he was incorporating all of the limitations
27  assessed by the DDS physicians, and then on the other hand, he
28  failed to actually do so in the RFC, I cannot accept defendant's

23 - FINDINGS & RECOMMENDATION

1  argument that the RFC is otherwise adequately supported.  The ALJ

2  erred in failing to incorporate the occasional push/pull limitation

3  into the RFC after indicating he was going to do so.

4      Plaintiff also argues that the way the ALJ phrased the

5  overhead activity limitation is inconsistent with the actual

6  limitation assessed by Dr. Kehrli and Dr. Pritchard.  As indicated

7  above, Dr. Kehrli and Dr. Pritchard found that plaintiff was

8  limited in "[r]eaching all directions (including overhead)."  Tr.

9  362.  They stated that the probable rotator cuff of the right

10  shoulder "limits reaching to occasional."  Id.

11      As also indicated above, the ALJ's limitation was that

12  plaintiff was limited to "occasional . . . overhead work above the

13  shoulder."  Plaintiff contends that while the ALJ's limitation is

14  similar to that expressed by Dr. Kehrli and Dr. Pritchard, it is

15  inadequate.  Plaintiff argues that the ALJ's limitation to

16  occasional overhead work is not as restrictive as that stated by

17  the two DDS physicians.

18      Plaintiff contends that occasional overhead work, as assessed

19  by the ALJ, allows a person to work overhead up to one-third of the

20  day, but does not restrict reaching, including overhead, for the

21  remainder of the work shift.  See Soc. Sec. R. 83-10, 1983 WL

22  31251, at *5 (defining "occasionally" to mean "occurring from very

23  little up to one-third of the time.").  The DDS physicians, in

24  contrast, according to plaintiff, limited plaintiff's overhead

25  activity to solely reaching, and then limited that activity to

26  occasionally, or one-third of the day.  Plaintiff argues that the

27  ALJ's restriction would erroneously allow plaintiff to reach all

28  day long.

24 - FINDINGS & RECOMMENDATION

1   Defendant responds by acknowledging that the ALJ did not adopt
2   all of the limitations assessed by Dr. Kehrli and Dr. Pritchard.
3   However, again, defendant argues that the ALJ's RFC was supported
4   by plaintiff's own testimony as well as Dr. French's assessment.
5   Additionally, defendant argues that the ALJ's limitation to only
6   occasional overhead work, which defendant argues reasonably
7   subsumes overhead reaching, pushing, and pulling, as opposed to an
8   additional limitation to occasional reaching in all directions, is
9   supported by substantial evidence and should be affirmed.

10      I disagree.   Similar to the ALJ's failure to explain his
11  adoption of Dr. Kehrli's and Dr. Pritchard's limitations on the one
12  hand and his omission of the push/pull restriction on the other,
13  the ALJ's decision is also internally inconsistent in regard to the
14  reaching limitation.    Dr. Kehrli and Dr. Pritchard limited
15  plaintiff to occasional reaching in all directions.    The ALJ's
16  restriction to occasional overhead work does not adopt this
17  limitation.    Additionally, given the ALJ's omission of the
18  push/pull restriction, I do not read the occasional overhead work
19  restriction to subsume overhead pushing and pulling as defendant
20  suggests.    This part of the ALJ's decision is inconsistent,
21  warranting remand and clarification.

22  III.  Depression

23      Finally, plaintiff faults the ALJ for failing to evaluate
24  plaintiff's alleged mental impairment.   Plaintiff notes that in an
25  October 27, 2003 written statement, his mother stated that
26  plaintiff "talks of suicide" when he is in bad pain.   Tr. 131.
27  Plaintiff also notes that in September 2004, he was diagnosed with
28  depression, and in May 2005, he was diagnosed with mild depression.

25 - FINDINGS & RECOMMENDATION

Tr. 398, 548.  He further states that he has taken Prozac for the depression.  Tr. 398.

The ALJ made a single mention of plaintiff's mental health. In discussing plaintiff's mother's statement, and rejecting most of her written testimony (which plaintiff does not challenge in this appeal), the ALJ stated that "[a]lthough she made references to his mental health, the claimant has never sought psychiatric care or treatment."  Tr. 18.

Plaintiff argues that the ALJ erred in failing to "secure an understanding" of the plaintiff's mental difficulties.  Plaintiff contends that the ALJ should have asked plaintiff about his depressive condition at the hearing and should have requested a consultative examination to evaluate the problem.  See 20 C.F.R. § 404.1519a(b) (requiring the ALJ to obtain a consultative examination "when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [a] claim.").  Plaintiff suggests that the ALJ should have found the alleged depression to be a severe impairment and consider it, along with plaintiff's other severe impairments, in assessing the combined effect of all of plaintiff's impairments.

In response, defendant contends that the ALJ properly concluded at step two that plaintiff had no severe mental impairment and that the ALJ was not required to further develop the record in this regard.  Defendant notes that the record shows only a mild depression, secondary to pain complaints, and treated with Prozac.  Furthermore, defendant states, the ALJ correctly stated that plaintiff had never sought psychiatric care or treatment.  As a result, defendant contends, the lack of treatment properly

1  undermines the credibility of any statements that plaintiff's
2  mental health is seriously impaired.

3      Notably, in this case, plaintiff never articulated depression
4  as an impairment, either in his written application or at his
5  hearing.  Thus, the only basis upon which the ALJ had to further
6  inquire was plaintiff's mother's written statement and a couple of
7  scattered references in the medical evidence.

8      The ALJ gave sufficient reasons for rejecting plaintiff's
9  mother's testimony.  The ALJ may disregard a lay witness's
10 testimony by offering reasons germane to the witness.  Dodrill v.
11 Shalala, 12 F.3d 915, 919 (9th Cir. 1993).  If the ALJ gives
12 "arguably germane reasons" for dismissing the lay witness
13 testimony, he is not required to "clearly link his determination to
14 those reasons."  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).
15 Here, the ALJ described that plaintiff's mother's written statement
16 included a response of "don't know" to the majority of the
17 questions and otherwise generally repeated his "verbal pain
18 complaints." Tr. 18. Furthermore, as defendant notes, plaintiff's
19 failure to seek psychiatric care or treatment is a valid basis upon
20 which to reject the credibility of her statements suggesting that
21 plaintiff's mention of suicide reveals a serious mental impairment.
22 See, e.g., Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999)
23 (ALJ may properly consider claimant's failure to request, or
24 doctor's failure to prescribe, treatment in assessing severity of
25 pain testimony).

26     The other relevant evidence in the record consists of a single
27 reference to depression, a single reference to mild depression, and
28 a reference to plaintiff being on Prozac for what appears to be a

27 - FINDINGS & RECOMMENDATION

1    period of a few months.  Even considered together, however, theses

2    pieces of evidence, without more, do not create an ambiguity about

3    plaintiff's mental condition necessitating any further inquiry by

4    the ALJ, including ordering a consultative examination.  E.g.,

5    Mayes v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001) (ALJ's

6    duty to supplement the record is triggered "only when there is

7    ambiguous evidence or when the record is inadequate to allow for

8    proper evaluation of the evidence."); Reed v. Massanari, 270 F.3d

9    838, 843 (9th Cir. 2001) (suggesting that when the evidence already

10   in the record is sufficient, consultative examination is not

11   required); 20 C.F.R. § 404.1519a(a)(1) & (2) (indicating that

12   Commissioner's decision to purchase a consultative examination is

13   made only after considering whether any additional information

14   needed is already available in the plaintiff's medical courses and

15   that a consultative exam is purchased when resolution of a conflict

16   or ambiguity is required).  Here, the evidence is not ambiguous and

17   is not inadequate to allow for a proper evaluation.  The ALJ did

18   not err in failing to further address plaintiff's alleged

19   depression.

20                              CONCLUSION

21        I recommend that the ALJ's decision be reversed and remanded

22   for further proceedings.

23                           SCHEDULING ORDER

24        The above Findings and Recommendation will be referred to a

25   United States District Judge for review.  Objections, if any, are

26   due March 5, 2008.  If no objections are filed, review of the

27   Findings and Recommendation will go under advisement on that date.

28        If objections are filed, a response to the objections is due

28 - FINDINGS & RECOMMENDATION

March 19, 2008, and the review of the Findings and Recommendation will go under advisement on that date.

     IT IS SO ORDERED.

                DATED this __20th__ day of __February__, 2008.


                          /s/ Dennis James Hubel
                          Dennis James Hubel
                          United States Magistrate Judge

29 - FINDINGS & RECOMMENDATION